UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| MATTHEW DONOVAN MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 15-47-GFVT |
| | ) | |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| CAROLYN COLVIN, | ) | **&** |
| Commissioner of Social Security, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

The Plaintiff, Matthew McCoy, brought this action pursuant to 42 U.S.C. § 405(g)
seeking judicial review of an administrative decision of the Commissioner of Social Security
(Commissioner) denying McCoy's application for child's disability insurance benefits (CIB) and
supplemental security income (SSI).  The Court, having reviewed the record and for the reasons
explained below, will DENY McCoy's Motion for Summary Judgment [R. 6] and GRANT that
of the Commissioner.  [R. 7.]

I

Matthew McCoy filed applications for CIB and SSI on August 23, 2012. [Transcript (Tr.)
161-62, 237-73.]  He alleges a disability beginning on October 31, 2006, due to depression,
anxiety, and breathing problems related to asthma.[1]  [Tr. 53, 257.]  McCoy's applications were
denied initially on October 24, 2012 [Tr. 167-70], and upon reconsideration December 7, 2012.
[Tr. 173-78.]  Subsequently, at McCoy's request, an administrative hearing was conducted by
video before Administrative Law Judge (ALJ) Jerry Meade on March 12, 2014. [Tr. 65-89.]

---

[1] A person claiming child's insurance benefits must establish the alleged disability began before age twenty-two.  20
C.F.R. § 404.350(a)(5); 42 U.S.C. § 402(d).  McCoy was born on September 26, 1991.  [Tr. 68, 135, 161.]

During the hearing, the ALJ heard testimony from McCoy, his mother, and from vocational expert (VE) Anthony Michael.  [*Id.*]  Following the hearing, ALJ Meade issued a decision denying McCoy's applications for child's DIB and for SSI on April 28, 2014.  [Tr. 57.]  McCoy, who was fifteen years old as of the alleged onset date, has a high school education and some college. [Tr. 55, 68, 69.].  He has no past relevant work. [Tr. 55.]  Despite McCoy's limitations, the VE testified at the hearing that there are several types of jobs at the medium, light, and sedentary levels that exist in significant numbers in the national and regional economies that McCoy could perform, and the ALJ accepted that testimony. [Tr. 56, 86-88.]

In evaluating a claim of disability, an ALJ conducts a five-step analysis.  *See* 20 C.F.R. §§ 404.1520, 416.920.[2]  First, if a claimant is working at a substantial gainful activity, he is not "disabled" as defined by the regulations.  20 C.F.R. §§ 404.1520(b); 416.920(a)(4)(i).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not "disabled."  20 C.F.R. §§ 404.1520(c), 416.920(a)(4)(ii).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is "disabled."  20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii).  Before moving to the fourth step, the ALJ must use all the relevant evidence in the record to determine the

---

[2] The Sixth Circuit summarized this process in *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469 (6th Cir. 2003):

> To determine if a claimant is disabled within the meaning of the Act, the ALJ employs a five-step inquiry defined in 20 C.F.R. § 404.1520.  Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work, but at step five of the inquiry, which is the focus of this case, the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile.

*Id.* at 474 (internal citations omitted).

claimant's residual functional capacity (RFC), which is an assessment of one's ability to perform certain physical and mental work activities on a sustained basis despite any impairment experienced by the individual.  *See* 20 C.F.R. §§ 404.1520(e), 404.1545.  Fourth, the ALJ must determine whether the clamant has the RFC to perform the requirements of his past relevant work, and if a claimant's impairments do not prevent him from doing past relevant work, he is not "disabled."  20 C.F.R. §§ 404.1520(e), 416.920(a)(4)(iv).  Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy, then he is "disabled."  20 C.F.R. §§ 404.1520(f), 416.920(a)(4)(v).

In this case, at Step 1, the ALJ found that McCoy has not engaged in substantial gainful activity since October 31, 2006, the alleged onset date. [Tr. 50.]  At Step 2, the ALJ found that McCoy suffers from the following "severe" impairments: asthma and depression.  [*Id*.]  At Step 3, the ALJ found that McCoy's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [Tr. 51-52.]  Before moving to Step 4, the ALJ then considered the entire record and determined that McCoy possessed the residual functional capacity (RFC) to perform "medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c)" with the following physical and mental limitations:

> [McCoy] can occasionally climb ladders, ropes or scaffolds.  He can frequently climb ramps or stairs.  He should avoid concentrated exposure to irritants such as fumes, odors, dust, gases, and poorly ventilated areas.  He is limited to simple, repetitive tasks.

[Tr. 52.]  After explaining in detail how he determined McCoy's RFC [Tr. 52-55], ALJ Meade noted at Step 4 that McCoy has no past relevant work.  [Tr. 55.]  At Step 5, the burden shifted to the Commissioner to identify a significant number of jobs in the national economy that McCoy

3

could perform, given his RFC, age, education, and experience.  *Jones*, 336 F.3d at 474; 20 C.F.R. §§ 404.1520(g), 404.1560(c).  Here, ALJ Meade concluded that, based on McCoy's age, education, and RFC, and based on the VE's testimony, a significant number of jobs in the regional economy exist that McCoy could perform, and therefore application of the Medical-Vocational Rules directly supports a finding of "not disabled."  [Tr. 56.]  Accordingly, on April 28, 2014, the ALJ issued an unfavorable decision, finding that McCoy was not "disabled" and therefore is ineligible for DIB and SSI.  [Tr. 56-57].  The Appeals Council declined to review the ALJ's decision on April 3, 2015 [Tr. 1-6], and McCoy now seeks judicial review in this Court.

## II

### A

This Court's review is limited to whether there is substantial evidence in the record to support the ALJ's decision.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Shelman v. Heckler*, 821 F.2d 316, 319-20 (6th Cir. 1987).  "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005) (citation and quotation marks omitted).  "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Longworth*, 402 F.3d at 595 (finding the same).  The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the court."  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*) (citations and quotation marks omitted).

4

In determining the existence of substantial evidence, courts must examine the record as a whole. *Cutlip, 25 F.3d at 286* (citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983)).  However, courts are not to conduct a *de novo* review, resolve conflicts in evidence, or make credibility determinations.  *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (citations omitted); *see also Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1228 (6th Cir. 1988).  Rather, if the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence in the record also supports the opposite conclusion.  *Ulman, 693 F.3d at 714*; *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 648 (6th Cir. 2011); *Longworth*, 402 F.3d at 595 (citations omitted).

**B**

McCoy's primary argument on appeal is that the ALJ failed to give the proper weight to certain medical and lay opinions in the record, and that in doing so, he failed to follow the mandate of SSR 85-16 in evaluating McCoy's RFC in light of his alleged mental impairments. Therefore, the Court will address McCoy's arguments within the context of examining whether substantial evidence supports the ALJ's RFC determination.  *See* 42 U.S.C. § 405(g).

An individual's RFC is an administrative determination about the person's maximum ability to perform work-related activities and reflects the most that the person can do in a work-related setting despite his or her limitations.  SSR 96-5p, 1996 WL 374183, at *5; 20 C.F.R. § 404.1545(a)(1).  This assessment "is based upon consideration of all relevant evidence in the case record," including medical evidence as well as the individual's own statements of what he or she can do. SSR 96-5p, 1996 WL 374183, at *5; 20 C.F.R. § 404.1545(a)(3).  Given the role of the Court at this stage in the process, the key issue is whether the ALJ's determination is

supported by substantial evidence.  *See* 42 U.S.C. § 405(g).  As noted above, this Court must give deference to the Commissioner's decision "[e]ven if this Court might have reached a contrary conclusion of fact . . . so long as [the decision] is supported by substantial evidence." *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854-55 (6th Cir. 2010); *Ulman*, 693 F.3d at 714.

Here, ALJ Meade determined that McCoy's only severe impairments were asthma and depression, but that those impairments did not prevent him from performing simple, repetitive tasks with certain limitations.  [Tr. 50, 56.]  The ALJ noted that although McCoy's asthma was severe, it has been successfully treated, he has not had recent emergency room visits or hospitalizations, and his recent physical exams revealed no significant physical limitations.  [Tr. 53-54.]  The ALJ further noted that there was no evidence in the record supporting that McCoy's complaints of breathing problems or other physical limitations caused any significant work-related functioning other than avoiding concentrated exposure to certain irritants and poorly ventilated areas. [Tr. 50-52, 55.]  McCoy apparently does not contest the ALJ's findings concerning his physical limitations.  [*See generally* R. 6-1; R. 7 at 2 n.3.]  Instead, McCoy primarily challenges the ALJ's determination concerning his mental RFC, arguing that ALJ Meade did not properly follow the directions given in Social Security Ruling (SSR) 85-16.[3]

For mental impairments that do not meet the listing severity, SSR 86-16 requires that the individual's inability to perform substantial gainful activity "must be demonstrated through a detailed assessment of the individual's capacity to perform and sustain mental activities which are critical to work performance."  SSR 85-16, 1985 WL 56855, at *1.  In making this assessment, certain types of evidence should be considered, such as:

---

[3] Federal regulations state that SSR's "are binding on all components of the Social Security Administration" as rulings that "represent precedent, final opinions and orders and statements of policy and interpretations" adopted by the agency.  20 C.F.R. § 402.35(b)(1).

History, findings, and observations from medical sources (including psychological test results), regarding the presence, frequency, and intensity of hallucinations, delusions or paranoid tendencies; depression or elation; confusion or disorientation; conversion symptoms or phobias; psychophysiological symptoms; withdrawn or bizarre behavior; anxiety or tension.

• Reports of the individual's activities of daily living and work activity, as well as testimony of third parties about the individual's performance and behavior.

• Reports from workshops, group homes, or similar assistive entities.

In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individual's strengths and weaknesses. Consideration should be given to factors such as:

• Quality of daily activities, both in occupational and social spheres (see Listing 12.00, Introduction), as well as of the individual's actions with respect to a medical examination.

• Ability to sustain activities, interests, and relate to others *over a period of time*. The frequency, appropriateness, and independence of the activities must also be considered. . . .

• Level of intellectual functioning.

• Ability to function in a work-like situation.

*Titles II & Xvi: Residual Functional Capacity for Mental Impairments*, SSR 85-16 (S.S.A. 1985), 1985 WL 56855, at *2.

Here, ALJ Meade carefully considered and explained his reasoning for his conclusion in this case. He considered the treatment records from Mountain Comprehensive Care Center (MCC) where McCoy sought treatment for depression and anxiety. [Tr. 53-55.] The ALJ also noted school records and testimony indicating that McCoy's anxiety and depression made it difficult for him to attend school regularly. [Tr. 53.] ALJ Meade particularly explained his consideration of the report from agency psychologist Dr. Leigh Ford based on a consultative psychological exam, and he compared Dr. Ford's opinion to the records and treatment notes from

7

MCC, the report of consultative examiner Dr. Timothy Gregg, and the other assessments of state agency consultants.  [Tr. 52-55.]  In doing so, ALJ Meade also compared the evidence in the record to the testimony of McCoy's mother and to McCoy's own testimony concerning his daily activities and social functioning.  When re-formulating McCoy's arguments in light of his assertion concerning SSR 85-16, it appears that his primary contentions are:  the ALJ did not give sufficient weight to Dr. Ford's opinion; the ALJ "failed to give adequate consideration to" the testimony of McCoy's mother, Sandra McCoy; and the ALJ also failed to consider several other factors listed in SSR 85-16.  [*See* R. 6-1 at 7, 9, 11-13, 14-15.]

**1**

McCoy first argues that the ALJ should have given more weight to the opinion of agency psychologist Dr. Ford.  [R. 6 at 7-8.]  The regulations require the ALJ to consider all relevant evidence in the record.  20 C.F.R. § 404.1527(b); § 416.927.  Generally, more weight is given to opinions from a treating source than to those of the state agency examiners because the treating source is better able to provide a longitudinal picture of an individual's impairments.  20 C.F.R. §§ 404.1527(c)(2), 404.927(c)(2).  In certain circumstances, however, opinions from state agency consultants are given significant weight or even greater weight, such as where the consultative opinion is based on a more complete case record with more detailed and comprehensive information than what was available to the individual's treating source, or where no sufficient treating source opinions are available.  SSR 96-6P, 1996 WL 374180, *3 (S.S.A. July 2, 1996); *Smith v. Colvin*, 2016 WL 3746537, *3 (E.D. Ky. July 8, 2016).  In general, "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."  20

C.F.R. § 404.1527(c)(3).  Section (c)(4) of the same regulation makes clear that greater weight is assigned to opinions that are "more consistent ... with the record as a whole."  § 404.1527(c)(4). The ALJ should also consider factors such as the source's understanding of disability programs and their evidentiary requirements, as well as the extent to which the source is familiar with additional information in a claimant's case record.  § 404.1527(c)(6).  Thus, the ALJ may not ignore the opinions of state agency consultants and must explain the weight given to their opinions.  SSR 96-6P, 1996 WL 374180, at *1; *see also* SSR 96–8p, 1996 WL 374184, *7. However, the ALJ must consider all other factors that could have a bearing on the weight given to the opinion, such as the consultant's specialization, and whether the opinion is consistent with the other evidence in the record.  SSR 96-6P, 1996 WL 374180, at *2-3;  § 404.1527(e)-(f).

Here, ALJ Meade considered the opinion of agency consultative examiner Dr. Ford, but chose to give "little weight" to what he believed was an "overestimate of the severity of [McCoy's] limitations" in light of the other evidence in the record.  [Tr. 54.]  On September 27, 2012, Dr. Ford performed a psychological evaluation of McCoy, diagnosed him with Intermittent Explosive Disorder (IED), and assigned him a GAF of 49.[4]  [Tr. 401-03.]  Doctor Ford noted that McCoy was "quite restless" and threw items such as pens and paper on the floor while in the waiting room, that he paced the floor loudly while Dr. Ford spoke with his mother, that McCoy's affect "appeared flat," his mood was "pessimistic and angry," and that his mother told Dr. Ford that McCoy becomes physically aggressive when angry and has broken TVs and punched doors. [Tr. 402.]  Doctor Ford concluded that McCoy appeared to have poor insight, some difficulty with decision-making skills, deficient coping skills, and some skill deficits in self-control and

---

[4] A GAF score is based on a 100-point scale and represents a particular mental health professional's subjective opinion of the claimant's overall mental functioning.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006).

daily living.  [Tr. 403.]  Based on these deficiencies, Dr. Ford opined that McCoy had "marked limitations" in his ability to tolerate stress and pressure of day-to-day employment and in his capacity to respond appropriately to supervision, co-workers, and various work pressures.  [*Id.*]

As required by the regulations outlined above, ALJ Meade explained his reasons for giving "little weight" to Dr. Ford's opinion about McCoy's limitations, noting that the limitations noted are "vague and excessive" and appeared to be based on "a snapshot of [McCoy's] functioning" rather than a longitudinal view based on past history and other records of psychological treatment.  [Tr. 54.]  In doing so, ALJ Meade appropriately gave more weight to the records of treating sources instead.  For instance, in terms of the IED diagnosis, the ALJ noted that it was based on a one-time evaluation of McCoy and was not consistent with the overall evidence in the record.  [Tr. 50-51.]  No treating source had ever made a similar diagnosis or noted significant limitations based on IED or related symptoms.  [*Id.*]  Indeed, the most recent treatment notes in the record from McCoy's visits to MCC[5] indicated that McCoy had only "moderate symptoms" [Tr. 571], and that although he was restless, depressed, and had some compulsive behaviors and short-term memory problems, he had "no problems" with anger or irritability, no full blown panic attacks, no manic/hypo manic moods or behaviors, and no psychotic symptoms or perceptual disturbances.  [Tr. 569, 571, 573.]

Additionally, the GAF score that Dr. Ford assigned McCoy was contradicted by higher scores from treating sources who examined McCoy just a few weeks prior to Dr. Ford's examination, as well as a few weeks afterward, and also in McCoy's most recent records from March 2014.  [Tr. 54, 411-19, 571.]  "A GAF score may help an ALJ assess [a claimant's]

---

[5] The Court notes that the treatment records McCoy submitted for care received after ALJ Meade issued his decision on April 28, 2014, are irrelevant and cannot be considered in this context.  [*See* Tr. 2.]

mental RFC, but it is not raw medical data." *Kornecky.*, 167 F. App'x at 503 n.7.  While a

particular score may be useful in determining a claimant's RFC, one GAF score alone is not an

adequate basis for a decision to award or deny benefits, because the ultimate determination must

be based on the record as a whole.  *See id.* at 511; *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235,

241 (6th Cir. 2003).  As required, ALJ Meade properly placed more weight on the records of

treating sources who had a longitudinal view of McCoy's condition than on the conclusion of Dr.

Ford who only performed a one-time examination.  *See* § 404.1527(c)(2)-(4); *see also Ealy v.

Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (discounting claimant's contention that

ALJ insufficiently considered certain health problems where claimant's treating physicians never

recommended any ongoing significant restrictions related to the alleged problems).

ALJ Meade also found Dr. Ford's opinion of McCoy's limitations to be inconsistent with

other state agency consulting opinions, and with McCoy's activities of daily living, which

revealed physical limitations rather than social ones.  [Tr. 54.]  According to McCoy's testimony

and other medical records, McCoy suffered only mild restrictions in daily living.  He played

video games daily, watched television, enjoyed reading, reported the ability to operate a

computer fairly well, assisted with household chores, prepared simple meals, could count

change, had no difficulty sleeping, and was able to adequately handle his personal care needs as

well as to manage bills and shopping.  [Tr. 51-52, 111-13, 265-73, 302-10, 411-19.]  Other state

agency psychologists agreed with Dr. Ford that McCoy could perform simple, repetitive tasks,

but also opined that although McCoy may have some problems with handling stress or changes

in routine, his limitations were less than marked.  [Tr. 112-115, 142-45.]  One agency

psychologist, Dr. Vandivier, opined that McCoy was moderately limited in maintaining attention

and concentration for extended periods, but concluded he was not significantly limited in other

areas of sustained concentration and persistence or in other work-related areas, and that he did not have any social interaction limitations.  [Tr. 142-45.]

Thus, the ALJ did not ignore Dr. Ford's opinion, and McCoy has not shown that ALJ Meade failed to follow the applicable regulations in how he evaluated it.[6]  Moreover, even if ALJ Meade had given more weight to Dr. Ford's opinion, it is far from clear that doing so would significantly alter the RFC determination.  For instance, Dr. Ford also determined that McCoy's attention, concentration, recall and memory capacities, speech, eye contact, and capacity for abstraction all appeared normal; his attitude was cooperative; his thought content was appropriate to mood and circumstances with no evidence of preoccupation of thought; and his thought organization appeared "goal-directed."  [Tr. 402.]  Despite the limitations Dr. Ford noted, she further opined that McCoy's ability to understand, remember, and carry out instructions for simple repetitive tasks, and to sustain attention and concentration in performing such tasks, was not affected.  [*Id.*]  Accordingly, ALJ Meade limited McCoy to performing simple, repetitive tasks, and therefore did not discount Dr. Ford's opinion.  In sum, it appears ALJ Meade only gave lesser weight to the limitations that were inconsistent with other evidence, but still considered the parts of Dr. Ford's opinion that were supported by the record.

McCoy also includes a summary assertion that Dr. Ford's opinion establishes that McCoy meets the criteria for Listing 12.04 for Affective Disorders.  [R. 6-1 at 4-5.]  However, he only mentions this in passing within the context of his recitation of the medical evidence, without

---

[6] To the extent that McCoy may imply the ALJ erred by not finding IED to be a severe impairment [R. 6-1 at 13-14], McCoy does not articulate a clear challenge to the ALJ's findings at Step 2, but instead focuses his arguments on the RFC assessment.  Therefore, and because Dr. Ford's opinion is the only evidence in the record that could possibly support such a finding, the Court has addressed the ALJ's consideration of IED within the context of McCoy's challenge to the weight given Dr. Ford's opinion generally, and finds that ALJ Meade adequately explained his reasoning for not including IED in the list of severe impairments at Step 2.  [Tr. 50-51.]

pointing to any specific portion of the record that would meet his burden of supporting such an assertion. *See Malone v. Comm'r of Soc. Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012) (citation omitted). Because the listed impairments considered at Step 3 of the sequential evaluation process "were designed to operate as a presumption of disability that makes further inquiry unnecessary," the evidentiary standards for determining disability by meeting the listed impairments are stricter than the standards employed at later steps in the sequential evaluation process. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990); *see* 20 C.F.R. §§ 404.1526, 416.926. The "mere presence of a mental impairment is not sufficient to meet the requirements of Listing 12.04." *Johnson v. Astrue*, 2012 WL 4090817, *8 (M.D. Tenn. Sept. 17, 2012). Rather, to qualify for a severe impairment under Listing 12.04, the claimant must meet *all* of the specified criteria in both Paragraph A and also in Paragraph B. 20 C.F.R. pt. 404, subpt. P, app.1 12.04; s*ee Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").

Thus, for Paragraph A, McCoy must show "[m]edically documented persistence, either continuous or intermittent" of either a "[d]epressive syndrome" described in subparagraph 1 or a "[m]anic syndrome" described in subparagraph 2. 20 C.F.R. pt. 404, subpt. P, app.1 12.04. For subparagraph 1, McCoy must establish having *at least four* out of nine characteristics. *Id.* For subparagraph 2, McCoy must establish having *at least three* of seven characteristics. *Id.* Even if McCoy meets this criteria, he must *also* establish that his condition results in *at least two* of the impairments in Paragraph B: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. *Id.* McCoy, however, fails to explain how Dr. Ford's opinion, even if given controlling weight, shows he

meets these requirements.  McCoy simply lists the criteria along with a broad assertion that he clearly meets Listing 12.04, but completely fails to explain the reasoning behind this conclusion or to point to any evidence in the record supporting it.  [R. 6-1 at 4-5.]  Even the most generous interpretation of Dr. Ford's report does not establish that McCoy suffered from more than two or three of the conditions in Paragraph A.  As for Paragraph B, the only impairment Dr. Ford's report might establish is that of marked limitations in social functioning.  [Tr. 403.]  McCoy also does not show how the evidence in the record could support that any of these conditions are of "[m]edically documented persistence," particularly since the records of treating sources, as well as McCoy's own testimony, flatly contradict the conclusion that McCoy meets the criteria in either paragraph.  [*See* Tr. 569, 571, 573; Tr. 111-13, 265-73, 302-10.]

Finally, while McCoy asserts that Dr. Ford's opinion is confirmed by other evidence in the record, the only such evidence he points to includes the lay testimony of Sandra McCoy, which is further addressed below, and the report from Dr. Zieba in McCoy's education records. [*See* R. 6-1 at 7-13.]  The record from Dr. Zieba is an extremely cursory report from April 2009, listing a diagnosis of depression and anxiety with no explanation of the reasoning behind that conclusion, and was simply included as part of McCoy's application for home instruction during the school year of 2008-2009.  [Tr. 328-33.]  The report contains no details whatsoever as to any specific limitations resulting from McCoy's condition at that time, other than the implication that he could not attend school, and therefore the report neither contradicts nor corroborates Dr. Ford's much later and more detailed opinion.  It also contains nothing that would undermine ALJ Meade's RFC determination, nor does it include additional evidence that he failed to consider.

Ultimately, it is the ALJ's responsibility to weigh the evidence in the record and to resolve any conflicts in that evidence.  *Ulman*, 693 F.3d at 714; *see also Bradley,* 862 F.2d at

1227; *Richardson v. Perales,* 402 U.S. 389, 399 (1971) ("The trier of fact has the duty to resolve" conflicting medical evidence).  In doing so, the ALJ is required to incorporate into the RFC only those limitations he accepts as credible.  *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); 20 C.F.R. § 416.929(c)(4).  Here, parts of Dr. Ford's opinion were contradicted by other medical opinions in the record, and the ALJ made a determination about what weight to give it, adequately explaining his reasoning based on each opinion's consistency with the record as a whole.  *See* § 416.927(c)(4) (requiring ALJ to consider whether an opinion is consistent with the record as a whole).  Although McCoy may wish the ALJ had weighed these evaluations differently, it is not the Court's prerogative to resolve conflicts in evidence or to second-guess the ALJ's carefully considered credibility determinations.  *See Ulman*, 693 F.3d at 713; *Bradley*, 862 F.2d at 1228.

## 2

As noted above, McCoy also contends that the ALJ failed to give appropriate weight to the testimony of his mother, Sandra McCoy.  [R. 6-1 at 8-9, 11-12.]  In addition to evidence from medical sources, the ALJ "may" also use evidence from other sources such as spouses, parents, and other relatives or friends.  20 C.F.R. § 404.1513(d)(1).  Unlike evidence supplied by medical sources, which may be used to establish the existence of a disability, *see* § 404.1513, evidence from lay sources may *only* be used "to show the severity of [the claimant's] impairment(s) and how it affects [his or her] ability to work."  § 404.1513(d); SSR 06–03p, 2006 WL 2329939.  The perspective of such non-medical sources should be "evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file."  *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007) (*citing* SSR 06–03P).  "In considering evidence from 'non-medical sources' who have not seen the individual in a professional capacity

in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06-03p, 2006 WL 2329939, at *6.

Here, Sandra McCoy testified during the hearing that McCoy had difficulty attending school because he had trouble relating to his classmates and his outbursts disturbed them. [Tr. 80.] She related that although McCoy was intelligent and attempted to participate on the academic team, he was "unable" to attend the meets because he stayed in bed, which his mother attributed to a result of anxiety attacks. [Tr. 80-81.] McCoy had poor school attendance because of these problems, and Ms. McCoy had to apply for him to receive instruction at home. [Tr. 81-82.] Ms. McCoy also testified that his anxiety and attendance issues prevented him from completing college, despite his attempts to attend two different universities. [Tr. 82-83.] McCoy's mother further described McCoy as having an unpredictable temper resulting in at least one outburst of anger during which he threw a phone and broke a television. [Tr. 83.]

ALJ Meade considered this testimony when formulating his conclusion, specifically acknowledging McCoy's problems with school attendance and anxiety attacks from a young age. [Tr. 53.] The ALJ properly explained that he gave Sandra McCoy's statements "some weight, to the extent that they are consistent with the objective evidence." [Tr. 55.] Consistent with the applicable regulatory mandates, however, ALJ Meade noted that Ms. McCoy's statements constituted a lay opinion since she was not medically trained to make "exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms," or other observations about unusual moods and mannerisms in the way that a licensed psychologist would do. [*Id.*] Therefore, the ALJ further explained that he could not give her testimony significant weight

16

because her statements were "not consistent with the preponderance of the opinions and observations by medical doctors." [*Id.*]  Such analysis and explanation is consistent with the way in which the Commissioner must evaluate lay testimony under the applicable regulations explained above.  *See* 20 C.F.R. § 404.1513(d); SSR 06–03p.

McCoy merely asserts, without more, that Sandra McCoy's testimony was consistent with the other medical evidence in the record. [R. 6-1 at 9, 11-13].  However, the only such evidence he points to is the report from Dr. Zieba discussed above that confirmed McCoy applied for home instruction due to alleged depression and anxiety; some treatment notations from MCC stating that McCoy was socially withdrawn and felt nervous around people and large crowds; and the fact that McCoy was often absent from school and could not complete college. [R. 6-1 at 8.]  None of these facts or records, however, contradict ALJ Meade's RFC determination or his conclusion that McCoy is capable of performing simple, repetitive tasks. Nothing in ALJ Meade's opinion disputes that McCoy has some measure of depression, anxiety, or difficulty coping in certain situations.  The ALJ simply gave more weight to the actual medical evidence in the record that gives detailed assessments of McCoy's specific skills and abilities, none of which contradicts his determination that McCoy is capable of some medium, light, or sedentary work.  As long as substantial evidence exists to support the ALJ's conclusion, this Court must affirm that decision.  *Ulman*, 693 F.3d at 714; *Bass*, 499 F.3d at 509.

Moreover, under the regulations, a claimant's "subjective allegations of disabling symptoms," are insufficient by themselves to support a finding of disability."  *See Duncan v. Sec'y of Health and Human Servs*., 801 F.2d 847, 852 (6th Cir. 1986) (citing § 404.1529); *see also* 42 U.S.C. § 423(d)(5)(A) ("[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability. . .").  Therefore, the ALJ is charged with the

17

responsibility of making credibility determinations when weighing the testimony of the claimant

and that of any other witnesses.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir.

2003) (citation omitted).  The ALJ's findings regarding credibility "are entitled to deference,

because of the ALJ's unique opportunity to observe the claimant and judge her subjective

complaints."  *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *see also Casey*, 987 F.2d at

1234 (finding that ALJ's conclusions regarding credibility "should not be discarded lightly and

should be accorded deference").

Here, ALJ Meade determined that the accuracy of Sandra McCoy's statements were

"questionable" because she was not medically trained to make medical assessments of a person's

symptoms.  [Tr. 55.]  Additionally, although Sandra McCoy reported that her son had serious

anger problems, as well as serious mental and social limitations [Tr. 79-85, 402], such testimony

was inconsistent with other medical reports in the record.  For instance, no treating source had

reported that McCoy had problems with anger or aggression, and at least some treatment notes

recorded the opposite.  [Tr, 573.]  Treatment notes from MCC in August 2012, the same month

McCoy filed for disability benefits, reported that McCoy denied having any problems with

depression or anxiety, that he did not know why his mother wanted him to come for treatment,

and that he planned to obtain a driver's license in the near future.  [Tr. 411-12.]  The MCC

providers assigned McCoy a GAF score of 60, indicating moderate symptoms.  In September

2012, similar treatment notes from MCC again indicated that McCoy stated he only came to the

clinic because his mother "wants him to look crazy so he will get his SSI check."  [Tr. 419.]

Other MCC treatment notes also reported that McCoy only came to the clinic because his mom

"nagged" him and wanted to him "to get [a] SSI check," that he planned to apply for a job, that

the reason he did not attend college was due to a lack of money, and that he continued to deny

having any problems with depression.[7]  [Tr. 416-19.]  Such contradictory evidence from treating

sources clearly undermines the reliability of Sandra McCoy's testimony and McCoy's own

subjective complaints, especially when no other treating sources corroborate the severity of the

alleged symptoms, and thus ALJ Meade appropriately gave them less weight.  *See Moon v.*

*Sullivan*, 923 F.2d 1175, 1183 (6th Cir. 1990) ("the ALJ may distrust a claimant's allegations of

disabling symptomatology if the subjective allegations, the ALJ's personal observations, and the

objective medical evidence contradict each other").  As long as the Court can "meaningfully

review" the ALJ's assessment of third-party statements, it is not necessary for the ALJ to

explicitly lay out the reasoning behind finding such statements incredible.  *O'Bryan v. Colvin*,

2014 WL 2167600 (W.D. Ky. May 23, 2014).  Here, ALJ Meade did explain why he afforded

less weight to Sandra McCoy's statements, and because his conclusion is reasonable and

supported by substantial evidence, the Court must uphold his credibility determination.  *Rogers*

*v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007).

**3**

McCoy briefly mentions several other arguments in support of his allegation that the ALJ

did not properly apply SSR 85-16, none of which have any merit.  [R. 6-1 at 11-13.]  For

instance, McCoy makes a vague allegation that ALJ Meade did not properly consider the factor

of "history, findings, and observations from medical sources," yet the only example he gives of

evidence that was allegedly ignored is the cursory 2009 report of Dr. Zieba already discussed

---

[7] McCoy did not seek any treatment for mental health again until January 2014, when he returned to MCCC and reported that he had been suffering from anxiety and depression since he was fifteen years old, and that he had problems with social anxiety, short-term memory, and sleeping, despite having consistently denied such symptoms before that time. [Tr. 536-37.]  This sporadic history of treatment with contradictions in McCoy's alleged symptoms further supports the ALJ's conclusions.  *See Moon*, 923 F.2d at 1182 (noting that despite claimant's allegations that his depression and obsessive compulsive disorder were disabling, "his medical history reveals only sporadic psychiatric visits that were often separated by years," and therefore did not adequately support his claims).

above, which contains nothing that ALJ Meade failed to take into account. McCoy also argues that the ALJ failed to consider his ability to sustain activities and relate to others over a period of time, and failed to consider his ability to function in a work-like setting.  [R. 6-1 at 12-13.]  In support, McCoy cites only his inability to finish college or attend competitions for the academic team.  [*Id.*]  The ALJ did not, however, ignore these facts, and he discussed them within the context of considering Sandra McCoy's testimony.  [Tr. 53.]  A failure to complete college or participate in academic competitions does not undermine ALJ Meade's overall RFC determination.  Additionally, McCoy's ability to function in a work-like setting is exactly what the RFC determination, as well as the hypotheticals posed to the VE during the hearing, take into account by limiting McCoy to simple, repetitive tasks.  Despite McCoy's protestations to the contrary, poor school attendance and dropping out of college do not by themselves establish that a person cannot work in any setting.

In sum, the regulations define a person's RFC as being "the most you can still do despite your limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also Luteyn v. Comm'r of Soc. Sec.*, 528 F. Supp.2d 739, 750 (W.D. Mich. 2007) ("RFC is the most, not the least, a claimant can do despite his impairments.").  Importantly, although McCoy accuses ALJ Meade of incorrectly assessing seriousness of his limitations, McCoy never explains how the ALJ failed to apply the appropriate legal standards, nor does he point to any medical evidence in the record demonstrating he is unable to perform any work as described by his RFC.  While McCoy may disagree with ALJ Meade's conclusions, this Court should not re-weigh evidence or substitute its judgment for that of the ALJ in making credibility determinations.  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).

## III

As explained above**,** this Court is limited to a determination of whether the ALJ's decision "is supported by substantial evidence and was made pursuant to proper legal standards." *Ealy*, 594 F.3d at 512 (citing *Rogers*, 486 F.3d at 241). Arguments reflecting mere disagreement with the ALJ's reasonable alternative interpretation of the evidence are not persuasive. *Hambrick v. Comm'r of Soc. Sec.*, 2014 WL 1961945, *7 (S.D. Ohio May 15, 2014). Here, substantial evidence supports the ALJ's finding that McCoy is not completely disabled and that a significant number of jobs exist in which McCoy may work and meaningfully contribute to society. Because the ALJ employed the proper test and directly addressed factors that he was required to consider, the Court must give deference to his assessment. *See Rogers*, 486 F.3d at 247. Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. McCoy's Motion for Summary Judgment [**R. 6**] is **DENIED**;

2. Defendant's Motion for Summary Judgment [**R. 7**] is **GRANTED**; and

3. **JUDGMENT** in favor of the Defendant will be entered contemporaneously herewith.

This the 3rd day of August, 2016.

Gregory F. Van Tatenhove
United States District Judge